***Reliable Contracting Company, Inc. v. Maryland Underground Facilities Damage Prevention Authority***
No. 47, September Term 2015

**Constitutional Law – Administrative Agencies – Quasi-Judicial Powers – Public Utilities.** The Maryland Underground Facilities Damage Prevention Authority is an administrative agency in the executive branch of State government and its exercise of quasi-judicial powers is subject to judicial review. Accordingly, its exercise of those powers is consistent with the Maryland Constitution and it must assess civil monetary penalties in accordance with statutory criteria. Maryland Code, Public Utilities Article, §12-101 *et seq.*; State Government Article, §10-1001.

Circuit Court for Anne Arundel County
Case No. 02-C-13-182390AA
Argued: January 8, 2016

IN THE COURT OF APPEALS

OF MARYLAND

NO. 47

September Term, 2015

_____

RELIABLE CONTRACTING
COMPANY, INC.

v.

MARYLAND UNDERGROUND
FACILITIES DAMAGE
PREVENTION AUTHORITY

_____

Barbera, CJ
Battaglia
Greene
Adkins
McDonald
Watts
Rodowsky, Lawrence F.
   (Retired, Specially
   Assigned),

JJ.

_____

Opinion by McDonald, J.

_____

Filed:   March 28, 2016

Underground infrastructure, such as the cables and pipes that distribute water, gas, electricity, and other substances essential to modern life, is susceptible to damage during excavations. To prevent such incidents, State law has established a "one-call system," sometimes referred to as "Miss Utility." Maryland Code, Public Utilities Article ("PU"), §12-101 *et seq.* Under that law, advance notice must be given to the one-call system of certain types of excavation so that the location of nearby pipes, cables, and related structures can be identified and marked. Those who fail to do so and damage underground pipes or cables are subject to civil penalties assessed by Respondent Maryland Underground Damage Prevention Authority ("the Authority").

This case arose when the Authority cited Petitioner Reliable Contracting Company, Inc., ("Reliable Contracting") for violating the statute and imposed a civil monetary penalty. Reliable Contracting challenges the constitutionality of the statutory provisions that empower the Authority to adjudicate violations and assess penalties. It argues that the statutory scheme violates the separation of powers set forth in the Maryland Constitution because it vests judicial power in a non-judicial body – the Authority. Reliable Contracting also contends that the statute fails to provide adequate guidance to the Authority for the assessment of penalties, which would also render it unconstitutional under a prior decision of this Court.

We hold that the statutes that govern the Authority suffer from neither constitutional defect. Like many other administrative agencies, the Authority's quasi-judicial powers are limited and subject to judicial review. It is true that the

statute authorizing the Authority to impose civil penalties does not itself specify the criteria for the Authority to consider in setting the amount of a civil monetary penalty. However, the General Assembly has enacted a general statute providing criteria for assessment of civil penalties by State administrative agencies when no other statute or regulation does so. Although the Authority itself questions whether that statute applies to it, we agree with the Court of Special Appeals that it does.

## I

## Background

### *A.     Statutory Framework*

*One-Call System to Protect Underground Facilities*

In the modern world, electricity, gas, oil, water, sewage, and other substances are transmitted underground via pipes, cables, and accessories that are subsumed under the generic statutory phrase "underground facilities."[1] Damage or dislocation

---

[1] *See* PU §12-101(o). That provision defines "underground facility" to mean:

> (1)…personal property that is buried or submerged for:
>
>> (i)     use in connection with the storage or conveyance of water, sewage, oil, gas, or other substances; or
>>
>> (ii)     transmission or conveyance of electronic, telephonic, or telegraphic communications or electricity.
>
> (2)     "Underground facility" includes pipes, sewers, conduits, cables, valves, lines, wires, manholes, attachments, and those portions of poles below ground.

2

of underground facilities can result in death or injury to individuals, damage to property, and the loss of essential public services.[2] To protect underground facilities, the General Assembly has enacted a comprehensive statutory scheme for regulating excavation or demolition that could damage them. PU §12-101 *et seq*. The statute applies to all excavation or demolition unless the "excavation or demolition is performed or to be performed: (1) entirely on the land on which the private residence of the owner or lessee is located; and (2) without the use of machinery." PU §12-103.

The statute creates a one-call system, colloquially known as "Miss Utility," which notifies owners of underground facilities of a planned demolition or excavation that may affect those facilities. PU §12-101(i) (definition of "one-call system"). Anyone who intends to perform a covered excavation or demolition must notify the one-call system in advance. PU §12-124(a). After notifying the one-call system, "[a] person may begin excavation or demolition only after the person receives notification from the underground facilities information exchange system of the one-call system confirming that all applicable owner-members have" marked any facilities or parts of facilities they have in the vicinity of the excavation or demolition. PU §12-127(a). "If a person knows or has reason to know that an underground facility in the area of a planned or ongoing excavation or demolition is not marked as required by this

---

(3) "Underground facility" does not include a stormwater drain.

[2] PU §12-102.

subtitle, the person may not begin or continue the excavation or demolition unless the person" takes certain precautions not relevant here. PU §12-127(e).[3]

*The Authority*

The statute creates the Authority to carry out certain enforcement and public education facets of the one-call system. The Authority consists of nine members appointed by the Governor from lists submitted by organizations representing various types of stakeholders. PU §12-107.[4] The members serve staggered two-year

---

[3] The statute also apportions liability for damages caused to underground facilities based in part on whether the owner of the facility and the excavator have complied with the statute. PU §12-120.

[4] The statute provides:

The nine members shall be appointed as follows:

(1)    one member from a list submitted to the Governor by the Associated Utility Contractors of Maryland;

(2)    one member from a list submitted to the Governor by the Public Works Contractors Association of Maryland;

(3)    two underground facility owners that are members of a one-call system from a list submitted to the Governor by the Maryland members of the Maryland/DC Subscribers Committee;

(4)    one member from a list submitted to the Governor by the one-call centers operating in the State;

(5)    one member who represents the State's underground utility locator community from a list submitted to the Governor by the Maryland members of the Maryland/ DC Damage Prevention Committee;

4

terms. "On the recommendation of the Authority, the Governor may remove a member for incompetence or misconduct." PU §12-107(e).

In carrying out its functions under the statute, the Authority is authorized to conduct hearings, at which testimony is to be given under oath and recorded. PU §12-113(a). The statute authorizes the Authority to issue subpoenas in conjunction with its hearings and its members may administer the oath to witnesses. PU §12-113(b)-(c). The Authority's decisions are to be made in writing and are subject to judicial review in accordance with the State Administrative Procedure Act. PU §12-113(d)-(e).

To the extent that the Authority requires funding to carry out its responsibilities, the General Assembly has directed the Authority not to look to appropriations in the State budget, but rather to obtains funds from "(1) a federal or State grant; (2) filing fees and administrative fees for complaints heard by the Authority ... ; and (3) any other source." PU §12-111(a); *see also* PU §12-106.

---

(6) one member who has experience in the field of underground utilities from a list submitted to the Governor by the Maryland Association of Counties;

(7) one member who has experience in the field of underground utilities from a list submitted to the Governor by the Maryland Municipal League; and

(8) one member of the general public from a list submitted to the Governor by the other appointed and qualified members of the Authority.

PU §12-107(b).

5

*Enforcement of the One-Call System by the Authority*

The Authority is charged with enforcing compliance with the notice provisions of the one-call system. It conducts hearings on complaints of violations, may assess a civil penalty when a violation is found, and may also enter into settlements in lieu of assessing a civil penalty. PU §12-112(a). For performing "an excavation or demolition without first providing the [required] notice ... and damag[ing], dislocat[ing], or disturb[ing] an underground facility," the Authority may assess a penalty of up to $2,000 for a first offense and up to $4,000 for each subsequent offense. PU §12-135(a)(1).[5] Other violations of the one-call system are subject to a civil penalty of up to $2,000. PU §12-135(a)(3). The Authority may also require a violator to participate in special training or adopt certain procedures to mitigate damage, in addition to or in lieu of a monetary penalty. PU §12-135(a)(2). As noted above, the Authority's decisions are subject to judicial review. PU §12-113(e).

In addition to its enforcement function, the Authority also administers a special, non-lapsing fund devoted to public education and the development of safety procedures. PU §12-117.[6]

---

[5] The statute provides for an alternative enforcement mechanism when a proceeding has not been initiated with the Authority. The Attorney General or the owner of a damaged facility may bring an action in court asking the court to assess a civil monetary penalty against the violator. PU §12-135(b). In addition, an owner or the Attorney General may seek a writ of mandamus or injunctive relief when an excavation or demolition threatens to damage a facility. PU §12-134.

[6] As with many other special funds, moneys in this fund, known by the acronym-resistant name Maryland Underground Facilities Damage Prevention

6

### B.    *Facts and Procedural History*

In February 2013, a local utility notified the Authority that Reliable Contracting had violated the statute by undertaking an excavation without using the one-call system and, as a result, had damaged the utility's facilities. On April 16, 2013, after an investigation, the Authority notified Reliable Contracting that it would assess a civil monetary penalty of $2,000 for a violation of PU §12-124(a) (excavating without notifying the one-call system) and a penalty of $1,000 for a violation of PU §12-127(e) (excavating with knowledge of an underground facility and without following proper procedures). The Authority indicated that the $1,000 penalty would be waived if Reliable Contracting completed damage prevention training offered by the Maryland Damage Prevention Committee. The notice stated that Reliable Contracting had the right to a formal hearing before the Authority.

Reliable Contracting requested a hearing. At the hearing in September 2013, it did not contest any of the Authority's findings; instead, it challenged the constitutionality of the Authority's enabling statute. Specifically, Reliable Contracting asserted that, in permitting the Authority to adjudicate violations and assess civil penalties, the statute conferred judicial power on a non-judicial body and thereby violated the separation of powers required by the State Constitution. Reliable Contracting also asserted that the statute failed to provide adequate guidance to the Authority for assessment of such penalties. On September 16, 2013,

_____

Education and Outreach Fund, do not revert to the General Fund at the end of the fiscal year.  PU §12-117(d).

7

the Authority issued a written decision that confirmed its earlier finding of violations and imposition of penalties, and that notified Reliable Contracting of its right to seek judicial review. The Authority did not explicitly address Reliable Contracting's constitutional arguments.

Reliable Contracting petitioned for judicial review in the Circuit Court for Anne Arundel County, reiterating the constitutional argument it had made to the Authority. On June 9, 2014, the Circuit Court issued a memorandum opinion and order rejecting those arguments and upholding the Authority's decision.[7] The Circuit Court held that the Legislature could confer quasi-judicial adjudicatory powers on an entity outside the judiciary so long as there was an opportunity for judicial review by a court, and observed that the Authority's statute allowed for such review. The Circuit Court also held that the grant of discretion to the Authority to assess civil monetary penalties without detailed guidance was acceptable because the Authority regulated in the area of public health and safety.

Reliable Contracting then appealed its constitutional claims to the Court of Special Appeals, which affirmed the Circuit Court. 222 Md. App. 683, 114 A.3d 303 (2015). The intermediate appellate court agreed with the Circuit Court that, "because the court has the opportunity to review the Authority's decision and render a final

---

[7] In addition to its constitutional argument, Reliable Contracting had also asserted in the Circuit Court that the Authority, in assessing the second penalty in the amount of $1,000, had exceeded its statutory authority. The Circuit Court rejected that contention. Reliable Contracting has not pursued that argument and we do not address it.

decision, the delegation of quasi-judicial adjudicatory power to the Authority is not unconstitutional." 222 Md. App. at 697. However, in contrast to the Circuit Court, the Court of Special Appeals did not decide whether "the statute's limitation on the circumstances in which the Authority has discretion to impose a civil penalty, along with the availability of judicial review of the Authority's decisions, would lead to the conclusion that the discretion given to the Authority is constitutional." *Id.* at 700. Instead, the Court of Special Appeals held that Maryland Code, State Government Article ("SG"), §10-1001[8] provided the necessary standards to guide the Authority's exercise of discretion. *Id.* at 700-2.[9]

---

[8] SG §10-1001 reads as follows:

> (a) In this section, "unit" means an officer or other entity in the Executive Branch.
>
> (b) Unless otherwise provided by statute or regulation, a unit of State government authorized by law to impose a civil penalty up to a specific dollar amount for violation of any statute or regulation shall consider the following in setting the amount of the penalty:
>
> > (1) the severity of the violation for which the penalty is to be assessed;
> > (2) the good faith of the violator; and
> > (3) any history of prior violations.

[9] One member of the appellate panel would have rested the decision on the same ground as the Circuit Court and not addressed the applicability of SG §10-1001 as the parties had not had an opportunity to brief the application of that statute to the Authority. 222 Md. App. at 702-3 (concurring opinion of Judge Arthur). In their briefs to us, the parties have now had the opportunity to address the application of SG §10-1001.

## II

## Discussion

The material facts in this case are undisputed and the only issues concern the alleged constitutional defects in the Authority's enabling statute. Accordingly, we consider the merits of the lower courts' resolution of those issues without deference. *See Schisler v. State*, 394 Md. 519, 535, 907 A.2d 175 (2006). We consider first the contention that the Authority's statute violates separation of powers in delegating judicial power to a non-judicial body. Second, we consider the argument that the statute fails to provide adequate guidance for the imposition of civil penalties.

### A. *Whether the Authority's Enabling Act is Unconstitutional*

Article IV, §1, of the Maryland Constitution provides, in pertinent part, "The Judicial power of this State is vested in a Court of Appeals, such intermediate courts of appeal as the General Assembly may create by law, Circuit Courts, Orphans' Courts, and a District Court." This is the Judicial Vesting Clause of the Maryland Constitution, analogous to Article III, Section 1, of the federal Constitution. Article 8 of the Maryland Declaration of Rights states "That the Legislative, Executive and Judicial powers of Government ought to be forever separate and distinct from each other; and no person exercising the functions of one of said Departments shall assume or discharge the duties of any other." This is the Separation of Powers clause – an

explicit statement of the principle of separation of powers that is only implicit in the federal Constitution.[10]

The Judicial Vesting Clause, together with the Separation of Powers Clause, "forbids any power in the Legislature to clothe administrative boards with any judicial authority." *Dal Maso v. Board of County Commissioners*, 182 Md. 200, 34 A.2d 464 (1943). However, administrative bodies may exercise quasi-judicial authority, which essentially consists of deciding questions of fact and law subject to judicial review. *Heaps v. Cobb*, 185 Md. 372, 378-79, 45 A.2d 73 (1945). "[T]he existence of [separation of powers] does not itself inhibit the delegation to an administrative agency of a blend of executive or legislative powers with powers judicial in nature; the determining factor is not so much the specific powers granted to the administrative agency, but rather the relationship of the courts to the exercise of that power." *County Council for Montgomery County v. Investors Funding Corp.*, 270 Md. 403, 436, 312 A.2d 225 (1973). The availability of judicial review is key because "the dangers inherent in government by administrative bodies lie[s] not in the blending of powers in a single body but in permitting that body's power to be

_____

[10] Reliable Contracting also cites Article 24 of the Maryland Declaration of Rights, which guarantees due process. It refers to that provision in conjunction with the *Investors Funding* case, described in some detail later in the text of this opinion. However, in assessing the due process claim in *Investors Funding,* the Court considered the adequacy of the procedural due process afforded by the county ordinance at issue in that case and whether it was void as an arbitrary, capricious, and unreasonable exercise of the police power. *County Council for Montgomery County v. Investors Funding Corp.*, 270 Md. 403, 443-46, 312 A.2d 225 (1973). No analogous contention is made here.

11

beyond check or review." *Insurance Commissioner v. National Bureau of Casualty Underwriters*, 248 Md. 292, 299, 236 A.2d 282 (1967).

The parties agree that the *Investors Funding* case provides a useful point of comparison. That case concerned Chapter 93A of the Montgomery County Code, entitled "Fair Landlord-Tenant Relations," which created a Commission on Landlord-Tenant Affairs ("Commission") that had the authority to enforce the provisions of Chapter 93A through any appropriate means, including powers:

   (1)   to impose a civil penalty not exceeding $1,000;

   (2)   to award money damages not exceeding $1,000;

   (3)   to award payments for temporary substitute housing;

   (4)   to terminate leases;

   (5)   to order repairs;

   (6)   to order the return of security deposits and rental monies paid.

*Investors Funding,* 270 Md. at 426-27. A number of landlords in the County, including Investors Funding Corporation, sought a declaratory judgment that the ordinance was unconstitutional. The landlords alleged that Chapter 93A "vest[ed] in an administrative body judicial powers reserved exclusively to the courts by Article IV, §1 of the Maryland Constitution." *Id.* Because prior cases had allowed for an administrative agency to adjudicate cases as long as the courts had the power to review the agency's decisions, the landlords suggested five additional considerations that might serve as indicia of judicial power: "(1) the power to make a final rather than an initial determination; (2) the power to make binding judgments; (3) the power

12

to affect the personal or property rights of private persons; (4) the exercise of power formerly held by a court; and (5) the fashioning of remedies which are judicial in nature." *Id.* at 436.

This Court responded to those arguments as follows: (1) the Commission had no power to make a final determination because its decisions were subject to judicial review; (2) the Commission had no power to make binding judgments because litigants must go to court to enforce compliance with the Commission's orders; (3) the power to affect the personal or property rights of private persons was delegated based on a legislative finding of public interest in landlord-tenant relations; (4) the exercise of power formerly held by a court was not dispositive; and (5) the Commission's power to fashion remedies was incidental to its regulatory powers. *Id.* at 437-41.

The Court's analysis of these five points in *Investors Funding* underscores the core rule arising out of the Court's prior cases: an administrative agency, as part of its administrative functions, may decide cases within the area delegated to it by the legislature as long as its decisions are subject to judicial review. *See Maryland Aggregates Ass'n v. State*, 337 Md. 658, 675-79, 655 A.2d 886 (1995). Hence, in this case, the Authority's ability to hold hearings and impose monetary penalties is not an unconstitutional vesting of judicial power in a non-judicial body. The Authority may decide individual cases, but its decisions are subject to judicial review. PU §12-113(e). Its power is not judicial, but quasi-judicial, and delegation of quasi-judicial power to an agency does not violate Article IV, §1 of the Maryland Constitution or Article 8 of the Maryland Declaration of Rights.

.

Reliable Contracting argues that the Authority's power is wholly judicial rather than quasi-judicial, even though the Authority's decisions are subject to judicial review, because the Authority does nothing but issue and decide citations. That is, the Authority's power to fashion remedies is not incidental to its regulatory powers, because it has no other regulatory functions.[11] It merely decides cases.

This contention is not entirely accurate. The legislative history of the Authority's enabling statute indicates that it was created to serve certain educational functions as well. Although the statutory one-call system has existed since 1974,[12] the Authority was not established until 2010. Chapter 635, Laws of Maryland 2010. That 2010 amendment was intended to satisfy standards for federal grants set forth in the Pipeline Inspection, Protection, Enforcement, and Safety Act of 2006, 49 U.S.C. §60134, which required "public education" efforts as well as enforcement through civil penalties by a state authority. *See* Revised Fiscal and Policy Note to Senate Bill 911 (April 8, 2010); Bill Review Letter of Attorney General Douglas F.

---

[11] In a related argument, Reliable Contracting "takes issue with having to submit to the plenary jurisdiction of an administrative body with which it has no relationship[,]" such as a permit or license. However, there is no requirement that a quasi-judicial administrative body issue licenses or permits in order to carry out the duties assigned to it by the Legislature. The Authority regulates excavations and demolitions as provided in the statute. Reliable Contracting performed an excavation or demolition subject to the statute that the Authority enforces. To be called to account by an administrative agency, an entity need have no more "relationship" with an agency than that the entity allegedly violated the statute that the agency enforces.

[12] *See* Chapter 863, Laws of Maryland 1974.

14

Gansler to Governor Martin O'Malley concerning Senate Bill 911 (May 12, 2010). In that regard, the Authority administers a special fund devoted to public education and outreach and it is authorized to allow a violator to mitigate a penalty by participating in special training, adopting safety procedures, and carrying out similar measures devised by the Authority.

Even if Reliable Contracting's description of the Authority's function were accurate, the Authority's power would still be quasi-judicial. The essence of quasi-judicial power is not that it is accompanied by other powers; it is that it is limited and initial, rather than plenary and ultimate in its sphere. The Maryland judiciary has general jurisdiction, and its final decisions are *final*; it may decide all cases of State law, and no other adjudicative body may reverse its judgments on the basis of State law. By contrast, the Authority's jurisdiction is sharply limited by statute, and its decisions are subject to affirmation or reversal by the courts. Thus, the Authority has quasi-judicial, rather than judicial, power, and the delegation of quasi-judicial authority does not violate Article IV, §1 of the Maryland Constitution or Article 8 of the Maryland Declaration of Rights.

**B.**    ***Whether There are Guidelines for Exercise of the Authority's Discretion***

Because agencies with quasi-judicial authority must be subject to judicial review, the *Investors Funding* decision held that an agency with the power to impose a civil penalty up to a specified amount must be given guidelines for determining the

15

penalty. Without such guidelines, there is no way for a reviewing court to determine whether the agency assessed a proper penalty. *Investors Funding,* 270 Md. at 441.[13]

Reliable Contracting contends that the statute creating the Authority has no such guidelines.[14] The Authority responds that there are detailed provisions specifying the circumstances when a penalty may be assessed, which is accurate but beside the point. The question in this case is not whether the statute provides adequate notice of the conduct that might subject an entity to a penalty, but whether the statute provides adequate guidance to the Authority and a reviewing court in order for the court to review the Authority's assessment of that penalty.

1. SG §10-1001

As noted above, the Court of Special Appeals held that the necessary guidelines are to be found in SG §10-1001, which instructs an administrative agency to consider (1) the seriousness of the violation, (2) the intent ("good faith") of the violators, and (3) any past history of violations. There is obviously little to quarrel with in these common sense criteria and SG §10-1001 would thus appear to put the issue to rest. But, by its terms, SG §10-1001 applies only to an officer or entity in the executive branch of State government and the Authority appears to be reluctant to embrace

---

[13] At least one commentator has suggested that subsequent decisions have diluted this aspect of the *Investors Funding* decision. *See* A. Rochvarg, Principles and Practice of Maryland Administrative Law (2011) at 212-14.

[14] Reliable has not argued that the Authority's determination of liability is unreviewable, as opposed to its assessment of the appropriate penalty.

State agency status. Reliable Contracting is, of course, happy to agree that the statute does not apply to the Authority. Further analysis is therefore necessary.

2. Factors that Determine Whether an Entity is a State Agency

To decide whether the Authority's discretion is guided by SG §10-1001 we must determine whether it is a State agency for the purposes of that statute.[15] This Court has noted that "there is no single test for determining whether a statutorily-established entity is an agency or instrumentality of the State for a particular purpose. All aspects of the interrelationship between the State and the statutorily-established entity must be examined in order to determine its status." *A.S. Abell Pub. Co. v. Mezzanote*, 297 Md. 26, 35, 464 A.2d 1068 (1983); *see also Central Collection Unit v. DLD Associates LP,* 112 Md. App. 502, 505-9, 685 A.2d 873 (1996).

A few examples are instructive. In *Moberly v. Herboldsheimer*, 276 Md. 211, 345 A.2d 855 (1977), this Court considered whether the Board of Governors of the Memorial Hospital of Cumberland ("Hospital"), was a private corporation or an agency of the City of Cumberland within the scope of the Public Information Act. The Court concluded that the Hospital was a City agency because: as a medical facility, the Hospital served a public purpose; two City officials, the Mayor and the President of the Board of Commissioners of Allegany County, served *ex officio* on the seven-member Board of Governors for the Hospital; and the Hospital was, by statute,

---

[15] We need not decide whether the Authority is a State agency for any other purpose. *Cf. Washington Suburban Sanitary Commission v. Phillips*, 413 Md. 606, 632, 994 A.2d 411 (2010) ("[A]n entity may qualify as a State agency for some purposes, while being classified as a local agency for other purposes.").

exempt from tort liability for the negligent operation of the Hospital. 276 Md. at 223-25.

In *Mezzanote*, this Court considered whether the Maryland Insurance Guaranty Association ("MIGA") was an agency or instrumentality of the State, also for purposes of the Public Information Act. The Court concluded that MIGA was a State agency because: it served a public purpose, namely "protect[ing] claimants, policyholders, and ... the public, by preventing member insurer insolvency and paying claimants on covered claims against an insolvent member insurer"; a public official, the State Insurance Commissioner, appointed the Board of Directors; the acts of the Board of Directors were generally subject to the State Insurance Commissioner's amendment and approval; and, by statute, it was exempt from State and local taxes other than property taxes, and from liability for actions taken in the performance of its duties. *Mezzanote*, 297 Md. at 37-39.

A statement in enabling legislation that disclaims an entity's connection to State government is not conclusive as to whether it is an agency or instrumentality of the State for certain purposes. For example, in *Napata v. Univ. of Maryland Med. Sys. Corp.*, 417 Md. 724, 12 A.3d 144 (2011) a statute stated that the University of Maryland Medical System ("UMMS") was not "a State agency, political subdivision, public body, public corporation, or municipal corporation." Maryland Code, Education Article ("ED"), §13-303(a)(2); *see also* ED §13-302(5)-(7). Nonetheless, applying the criteria developed in the cases described above and others, this Court

18

held that the UMMS was "an instrumentality of the State" for purposes of the PIA rather than a private corporation. 417 Md. at 736-37.

Similarly, in *Central Collection Unit v. DLD Associates LP*, *supra*, the Court of Special Appeals considered whether the Injured Workers' Insurance Fund ("IWIF") was a State entity for purposes of sovereign immunity even though IWIF's enabling legislation stated that it was "independent of all State units."[16]  After considering "the entire relationship between IWIF and the State," including many of the factors considered in *Mezzanotte*, the court concluded that IWIF was properly characterized as a State agency or instrumentality.  The intermediate appellate court noted that IWIF had been established by the Legislature, that the members of its governing board were appointed by the Governor, and that various other obligations were imposed on it by statute.  Notably, although it was required to submit copies of its budget to the Legislature "for informational purposes," it was not funded by appropriations in the State budget.  Also, IWIF's existence could be ended by the Legislature.  Although various other statutory provisions granted IWIF "self-control" – *e.g.*, it was exempt from State personnel laws – the court concluded that the "entire relationship" between IWIF and the State indicated that it was a State agency for purposes of sovereign immunity.

---

[16] The law relating to IWIF has been substantially amended with the creation of the Chesapeake Employers' Insurance Company in 2012.  *See* Maryland Code, Labor and Employment Article, §10-101 *et seq.*; Insurance Article, §24-301 *et seq.*

19

These cases indicate that some of the relevant factors include: the purpose of the entity (public or private); the degree of control exercised by the government over the membership and decision-making of the entity; and any special immunities from tax or tort liability granted the entity. Neither a disclaimer of agency status nor funding outside the budget process necessarily precludes status as a State agency or instrumentality. The goal of the analysis is to examine the relationship between the State and the entity, so these factors are not necessarily exhaustive.

3. Application to the Authority

*Public Purpose*

Here, the Authority was created by statute to serve a public purpose, namely maintaining public safety in underground facilities. To carry out that purpose, the Authority exercises governmental powers – *e.g.*, it issues subpoenas, conducts contested case hearings, imposes civil penalties, requires individuals and entities to undergo training and adopt safety measures, and oversees a special fund established by law. Its decisions in contested cases are reviewable in the same manner as those of most other administrative agencies in the executive branch.[17] The Authority's officials and employees are designated as "State personnel." SG §12-101(a)(2)(xiii). This factor alone is a strong indication that the Authority is a government agency, in

_____

[17] As noted above, under PU §12-113(e), the decisions of the Authority are reviewed under the State Administrative Procedure Act ("APA"). The contested case provisions of the APA, including those concerning judicial review, apply to executive branch agencies (though some executive branch agencies are exempted) and explicitly not to agencies of the legislative or judicial branches. *See* SG §10-203.

part because it suggests that the General Assembly actually intended the Authority to be part of the government.

*State Control*

It is argued that the Authority is not subject to the control of other State officials or entities. In the first place, it is worth noting that the State need not exercise complete control over the Authority in order that the Authority be a State agency. *See Mezzanote*, 297 Md. at 37. Hence, even if the State does not exercise complete control over the Authority at every moment and in every respect, that is not dispositive. The State still oversees the Authority and retains essential control over major actions of the Authority, because the Governor appoints and removes members of the Authority, the Authority's decisions are subject to judicial review, and the Authority's existence depends on the Legislature.

There is no question that the Authority is a somewhat unusual entity. For example, it is at least somewhat financially independent. It is the expressly declared intent of the General Assembly that the Authority "not be funded by appropriations from the State budget." PU §12-106(b). But this does not mean that the Authority will never receive funding from the State. The Fiscal and Policy Note to the bill creating the Authority acknowledged that appropriated funds might be used in some circumstances to support the Authority. *See* Revised Fiscal and Policy Note for Senate Bill 911 (April 8, 2010) at 7 ("To the extent other sources are not sufficient to cover administrative expenses, it is assumed general funds would be required.").

Thus, although the Authority ordinarily is financially independent of the State, it may receive State funding under some circumstances.

Moreover, even if the Authority were completely financially independent, there can be independently funded government agencies. As noted above, IWIF was not funded through the State budget. The hospital in *Moberly* was effectively financially independent: if the Hospital ran a budget deficit in a year, the City of Cumberland was empowered, but not required, to cover the gap. *See Moberly*, 276 Md. at 224.

For another example of the Authority's unusual nature, the Governor appoints and removes members of the Authority, but the Governor's discretion is constrained. Appointment must be from lists submitted by stakeholders. PU §12-107(b). Removal is for cause and "[o]n the recommendation of the Authority[.]" PU §12-107(e).

Appointment by the Governor from a list or nomination originating with another entity is not unprecedented. *See, e.g.,* Maryland Code, Health Occupations Article ("HO"), §14-202 (certain members of Board of Physicians to be chosen from lists submitted by medical schools)[18]; HO §4-202 (dentist and dental hygienist members of Board of Dental Examiners to be appointed from lists submitted by Board); Maryland Code, Criminal Procedure Article ("CP"), §14-102(a)(2), (c)(1) (State Prosecutor, whose office is an independent unit in the Office of the Attorney General,

---

[18] In *Commission on Medical Discipline v. Stillman*, 291 Md. 390, 435 A.2d 747 (1981), this Court considered a predecessor of the Board of Physicians – the Commission on Medical Discipline – whose membership was heavily dependent on the State medical society. Nonetheless, even though members were appointed from a list submitted by a private entity and some members served *ex officio* due to their positions in that entity, this Court had no doubt that the Commission on Medical Discipline was a government agency. 291 Md. at 394.

is appointed by Governor based on nomination by the State Prosecutor Selection and Disabilities Commission).

A statute that provides for removal of a public official for cause by the Governor on the recommendation of someone else is unusual, but again it is not unprecedented for removal of a member of a State agency to be initiated by someone other than the appointing authority. *See, e.g.*, HO §20-202(h)(2) (removal from State Board for Certification of Residential Child Care Program Professionals, based on the recommendation of the Children's Cabinet); HO §21-202(g) (removal from the State Board of Environmental Health Specialists, based on the recommendation of the Secretary of Health and Mental Hygiene); CP §14-102(d) (removal of State Prosecutor, based on the recommendation of the State Prosecutor Selection and Disabilities Commission).[19] Hence, the unusual appointment and removal provisions for members of the Authority do not prevent the Authority from being a State agency.

Thus, the unusual, though not unprecedented budgetary, appointment, and removal provisions in the Authority's statute do not eliminate State control over the Authority. On the contrary, the State maintains considerable control over the composition and actions of the Authority.

---

[19] We note that Article II, §15 of the State Constitution provides that the Governor may remove civil officers for incompetence or misconduct without regard to whether removal is recommended by another official or entity. For purposes of this opinion, we need not decide whether PU §12-107(e), which states that the Governor may remove members of the Authority for incompetence or misconduct "[o]n recommendation of the Authority" purports to limit the Governor's authority contrary to the Constitution.

*Immunities*

As noted above, the Authority's officials and employees have been designated as "State personnel" in SG §12-101 and accordingly, like others designated as State personnel in that statute, have immunity from tort liability under the Maryland Tort Claims Act. SG §12-105; Maryland Code, Courts & Judicial Proceedings Article, §5-522(b). That immunity, of course, is linked to the State's waiver of its own immunity for the particular tortious action. This is another factor that strongly indicates that the Authority is a State agency.

*Consistency with the Purpose Underlying SG §10-1001*

A final consideration is that we are deciding whether the Authority is a State agency under SG §10-1001, rather than any other statute. As the Court of Special Appeals noted, the legislative history of SG §10-1001 shows that the General Assembly intended it to apply to agencies like the Authority.[20] The 1993 legislation was a direct response to *Investors Funding*, intended to bring every agency that had not already adopted its own criteria for monetary penalties into compliance with *Investors Funding* such that the problem identified in that case would never recur. *See* Senate Judicial Proceedings Committee, Bill Analysis, Senate Bill 122 (1993) (Senate Bill 122 "is designed to address [*Investors Funding*] by codifying a basic set of guidelines for setting civil penalties while allowing an existing statute, ordinance, or regulation to control."); Letter from Attorney General J. Joseph Curran, Jr. to

---

[20] 222 Md. App. at 700-2.

24

Governor William Donald Schaefer (April 23, 1993) (Senate Bill 122 was passed to bring agencies into compliance with *Investors Funding* "by establishing statutory standards, but without impinging on agency discretion to adopt different standards by rule."). The 1993 legislation was meant to cover *any* administrative agency affected by the holding in *Investors Funding*; it enacted not only SG §10-1001 applicable to State administrative agencies and officers, but also a similar provision applicable to administrative officers and agencies in local governments.[21]

*Summary*

In short, the Authority is a State agency for the purposes of SG §10-1001 and the standards for the amount of the penalty that the Authority imposes are those set forth in SG §10-1001.

Although we agree with the Court of Special Appeals that, in assessing a civil monetary penalty, the Authority is to apply the criteria in SG §10-1001, we differ slightly in our disposition of this case, as it is not clear that the Authority applied those criteria in this case. The Authority's decision does not make reference to the seriousness of the violation, or the good faith of Reliable Contracting, although the Authority's decision does refer to it as a "first time violation" which indicates no history of past violations. Moreover, given the Authority's position before us that SG §10-1001 does not apply to it, we cannot infer that it silently considered the other two criteria in that statute. Accordingly, we will remand this case to the Authority for

---

[21] That provision is now codified as Maryland Code, Local Government Article, §1-1304.

consideration of those criteria and reassessment of the penalty. In doing so, we do not mean to suggest that the Authority must necessarily come to a different result.

**III**

**Conclusion**

For the reasons set forth above, we hold:

1 – The Authority is an administrative agency that exercises quasi-judicial powers that are subject to judicial review. Accordingly, its enabling law is not contrary to either the Judicial Vesting Clause of Article IV, §1, of the Maryland Constitution or the Separation of Powers Clause of Article 8 of the Maryland Declaration of Rights.

2 – Because the Authority is an administrative agency in the executive branch of State government, SG §10-1001 provides guidelines for the exercise of its discretion in assessing civil penalties.

> JUDGMENT OF THE COURT OF SPECIAL APPEALS VACATED AND CASE REMANDED TO THAT COURT WITH INSTRUCTIONS TO REMAND THE CASE TO THE CIRCUIT COURT FOR ANNE ARUNDEL COUNTY WITH INSTRUCTIONS FOR THAT COURT TO REMAND THE CASE TO THE MARYLAND UNDERGROUND DAMAGE PREVENTION AUTHORITY FOR REASSESSMENT OF THE CIVIL MONETARY PENALTY CONSISTENT WITH THIS OPINION. COSTS TO BE PAID BY PETITIONER.